UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x

NORA MONACO,

        Plaintiff,

        -against-

DXC TECHNOLOGY SERVICES, LLC,
and COMPUTER SCIENCES
CORPORATION,

        Defendants.
-----------------------------------------------------x

**MEMORANDUM AND ORDER**
18-CV-372 (RPK) (RML)

RACHEL P. KOVNER, United States District Judge:

Plaintiff Nora Monaco brings this action under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, against her former employer, Computer Sciences Corporation ("CSC"), and its parent company, DXC Technology Services, LLC ("DXC"). Plaintiff claims that CSC violated the FMLA by terminating her employment in retaliation for taking FMLA leave, and that DXC is also liable for the violation as CSC's successor-in-interest. Defendants have moved for summary judgment. They contend in relevant part that plaintiff's employment was terminated as part of a reduction in force, and that plaintiff has not put forward evidence from which a jury could infer that this nonretaliatory explanation was pretextual. As explained below, defendants' motion for summary judgment is granted.

## BACKGROUND

CSC provides information technology products and services to private-sector industries, including the telecommunications industry. *See* Defs. Rule 56.1 Statement of Facts ¶ 1 ("Defs. 56.1") (Dkt. #25-2); Pl. Rule 56.1 Counterstatement of Facts ¶ 1 ("Pl. 56.1") (Dkt. #44-1). Plaintiff Nora Monaco worked for AT&T as a computer programmer until April 2000, when CSC entered

1

into an outsourcing agreement with AT&T.  Pl. 56.1 ¶¶ 5-7; Dep. of Nora Monaco at 36:7-16, 40:20-41:19 ("Monaco Dep.") (Dkt. #28); Dep. of Joseph Zipp at 21:19-24:16 ("Zipp Dep.") (Dkt. #27-1).  Under the outsourcing agreement, plaintiff and many other former AT&T employees were offered and accepted positions at CSC.  Pl. 56.1 ¶¶ 6-7, 13; Monaco Dep. at 40:20-41:19.  Plaintiff continued to support the AT&T account as a computer programmer throughout her employment at CSC.  Pl. 56.1 ¶¶ 13, 17; Monaco Dep. at 29, 36, 40-41, 52.

In 2002, plaintiff began reporting to Joseph Zipp.  Pl. 56.1 ¶ 19.  Zipp had also transitioned from AT&T to CSC after the companies entered into the outsourcing agreement.  *Id.* ¶ 11.  Later, he assumed managerial responsibility over an applications group of which plaintiff was a member.  *Id.* ¶¶ 11, 19; Zipp Dep. at 26-29.  Zipp originally managed six employees, including plaintiff.  Pl. 56.1 ¶ 19; Zipp Dep. at 29-30, 55, 74-75.  Under the outsourcing agreement, however, CSC was required to reduce the costs on the AT&T account every year.  As a result, there were regular reductions in force at CSC.  Pl. 56.1 ¶¶ 8-9, 24-26; Zipp Dep. at 30-33, 49-51, 54-64; Monaco Dep. at 70-71, 110-112.  Zipp's group was subject to multiple reductions in force.  Pl. 56.1 ¶ 26; Zipp Dep. at 49-50, 54-64.  Before each one, Zipp's manager asked him to rank his direct reports according to performance, criticality to the business, and job skills.  Pl. 56.1 ¶ 27; Zipp Dep. at 44-45, 119-124.

Plaintiff requested leave under the Family and Medical Leave Act multiple times during her employment at CSC.  In 2008, plaintiff was approved for FMLA leave in connection with the birth of her children.  Pl. 56.1 ¶ 34; Zipp Dep. at 86:11-18.  In 2014, plaintiff again sought leave to care for her mother, who could no longer cook, bathe, or climb stairs without help.  Pl. 56.1 ¶¶ 35-38; Monaco Dep. at 12-21, 24-25.  Plaintiff told Zipp that she intended to request FMLA leave, and Zipp, who had no authority to approve or deny such a request, directed plaintiff to contact

human resources. Pl. 56.1 ¶¶ 33, 38; Monaco Dep. at 75-87; Zipp Dep. at 86:5-87:17. Plaintiff was approved for the leave and cared for her mother from June to September 2014. Pl. 56.1 ¶ 38. Twice more, in 2015 and 2016, plaintiff applied for FMLA leave. Plaintiff's application was approved each time, and she took leave to care for her mother from June to September 2015 and from June to September 2016. *Id.* ¶¶ 46, 50; Monaco Dep. at 91:2-92:17, 101:9-103:19.

Zipp and plaintiff interacted while plaintiff was on FMLA leave. The parties offer different accounts of those interactions. Plaintiff states in an affidavit that when she took FMLA leave in 2014, she told Zipp that "he could reach out to [her] with questions about any work" but "did not say that [she] would be able to perform work." Monaco Aff. ¶ 9 (Dkt. #33). Plaintiff claims that Zipp nevertheless asked her to do work while she was on leave. *Id.* ¶ 10. According to plaintiff, she agreed to do so because she believed her job depended on it. *Ibid.* Plaintiff adds that although she "felt obligated" to agree, she ultimately did not work while on leave because she did not have time. *Ibid.*

Plaintiff has also submitted four text messages and an email that Zipp and another employee, Paul Hill, sent to plaintiff while she was on leave in 2015 and 2016. *Id.* ¶ 11; *see id.*, Ex. 1 (Dkt. #33-1). In the messages, Zipp and Hill asked plaintiff questions about work, including whether plaintiff could write "two test cases," whether she could call a colleague about "csharp," and whether she approved a date for the deployment of a "migration project" "on the QT of course." *Id.* ¶ 11; *see id.*, Ex. 1. Zipp also asked plaintiff, "how's vacation?" before asking plaintiff a question about "csharp." *Id.* ¶ 12; *id.*, Ex. 1 at 1. Plaintiff had told Zipp that she would work on the migration project while she was on leave, even though Zipp responded that she should not feel obligated to help. Pl. 56.1 ¶¶ 40, 51; Zipp Dep. at 91:3-93:11; Monaco Aff. ¶¶ 9-10.

3

While plaintiff was gone, Zipp assigned plaintiff's job responsibilities to other employees with similar skillsets or knowledge, including an employee named Steven Petraglia. Upon plaintiff's return after each leave, her job responsibilities remained the same as before her leave or increased. Pl. 56.1 ¶¶ 43-44, 48, 52; Zipp Dep. at 89:24-91:2; Monaco Dep. at 86:11-25, 98:22-100:25, 106:5-25.

In January 2017, Zipp's manager informed Zipp that his group would undergo another reduction in force, and that two employees would be laid off. Pl. 56.1 ¶ 54; Zipp Dep. at 111. The parties dispute what happened next. According to defendants, Zipp's manager identified plaintiff and another employee, Tammy Comello, as the individuals to be laid off. Defs. 56.1 ¶ 55; Zipp Dep. at 111. Zipp testified that he expressed a preference for retaining both plaintiff and Comello. Defs. 56.1 ¶¶ 56; Zipp Dep. at 111:23-112:8. But he testified that he decided to remove Comello from consideration for layoffs because she was one of only two employees responsible for managing "ITMS tables." Defs. 56.1 ¶¶ 55-57; Zipp Dep. at 111-114. Zipp therefore replaced Comello as one of the employees to be laid off with Joseph Marenda, whose responsibilities Zipp could perform himself if necessary. Defs. 56.1 ¶ 57; Zipp Dep. at 112-113. Marenda had never taken FMLA leave while he was employed by CSC. Defs. 56.1 ¶ 69; Pl. 56.1 ¶ 68; Decl. of Ira Katz ¶ 10, Ex. 4 ("Katz Decl.") (Dkt. #30-3).

Zipp testified that in contrast to Comello, plaintiff's work could be divided among other employees. Specifically, Zipp stated that plaintiff's work could be handled by Zipp himself and by Petraglia—an employee who had taken FMLA leave in the past and who was at the top of Zipp's employee rankings. Defs. 56.1 ¶¶ 57-59, 62-64, 68-69; Zipp Dep. at 113-119. Zipp also testified that plaintiff was at the bottom of Zipp's employee rankings for this reduction in force

because while she was a "solid performer," Zipp Dep. at 105:22, the remaining employees in Zipp's group were all top performers, *see* Defs. 56.1 ¶ 58; Zipp Dep. at 105, 113-115.

Plaintiff and Marenda were laid off. Defs. 56.1 ¶ 60. Defendants claim that plaintiff's termination had nothing to do with plaintiff's choice to take FMLA leave. *Id.* ¶ 61; *see* Zipp Dep. at 111-112.

Plaintiff, by contrast, argues that her termination was primarily motivated by her FMLA leave. Plaintiff points to evidence that Zipp asked plaintiff to perform work during her FMLA leave as evidence that Zipp had taken issue with her decision to take FMLA leave. Pl. 56.1 ¶ 45; Monaco Dep. at 142:14-151:4; Monaco Aff. ¶¶ 9-13. Plaintiff also asserts that in 2016, John Pennisi, a manager of a project to which plaintiff was assigned, told her that when considering whom to layoff, Zipp asked Pennisi, "would you rather have [plaintiff] for 9 months a year or David Gonzalez for 12 months a year?" Monaco Aff. ¶ 13; Monaco Dep. at 120:25-121:20. Further, plaintiff disputes CSC's reasons for keeping Comello, claiming that Comello had the same performance scores as plaintiff and that Comello's work was not as crucial to the group as Zipp suggested. Monaco Aff. ¶¶ 15-17. Plaintiff does not dispute that five other members of Zipp's group had taken FMLA leave in the past, including Petraglia. Pl. 56.1 ¶ 68; Zipp Dep. at 81-83.

The parties agree that after plaintiff's termination from CSC, plaintiff's responsibilities were primarily redistributed to Petraglia and Gonzalez. Pl. 56.1 ¶ 61; Zipp Dep. at 66-67, 70-71, 117-118. Both those employees had received better annual performance appraisals than plaintiff. *See* Pl. 56.1 ¶ 63; Katz Decl. ¶¶ 11-13, Exs. 5-9.

Plaintiff has not been employed since she was terminated by CSC in January 2017. Pl. 56.1 ¶ 71; Monaco Dep. at 30:7-11. Zipp assisted plaintiff in her efforts to find a different role within CSC, where plaintiff unsuccessfully sought two other positions. Pl. 56.1 ¶ 69; Monaco

5

Dep. at 32:16-33:13.  Plaintiff also applied for six jobs outside CSC, all in 2017.  She received one offer from a park in the Catskills, but ultimately declined that job.  Pl. 56.1 ¶¶ 70-71; Monaco Dep. at 30:12-35:4.  Plaintiff did not apply for any other positions before filing suit.  Pl. 56.1 ¶ 72; Monaco Dep. at 34:24-35:4.

In April 2017, CSC merged into and became a wholly owned subsidiary of DXC.  Pl. 56.1 ¶ 2; Katz Decl. ¶ 3.

In January 2018, plaintiff filed this lawsuit against CSC and DXC.  *See* Compl. ¶¶ 1-2 (Dkt. #1).  Plaintiff alleged that both CSC and DXC were her "employers" under the FMLA, and that CSC had unlawfully terminated her in retaliation for exercising her FMLA rights.  *See id.* ¶¶ 28-39.  Plaintiff seeks damages, attorney's fees, and costs.  *See id.* ¶ 2.

Defendants have moved for summary judgment.  *See* Defs. Mem. of L. in Supp. of Mot. for Summ. J. ("Defs. Br.") (Dkt. #26-2).  Among other arguments, defendants contend that plaintiff has failed to create a genuine factual dispute as to whether her termination was retaliation for her exercise of FMLA rights.  *Id.* at 7-18.  At the Court's request, the parties filed supplemental briefs on the admissibility of Pennisi's statement to Zipp.  *See* Order Dated Feb. 9, 2021; Letter Briefs (Dkt. #45, #46).

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a factual dispute is material if it "might affect the outcome of the suit under the governing law."  *Frost v. New York City Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020).  In determining whether there is a genuine issue of material fact, the Court evaluates the whole record,

resolving all ambiguities and drawing all permissible factual inferences in favor of the non-movant. *See ibid.*; *see also Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011). However, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

## DISCUSSION

Plaintiff has not raised a genuine issue of material fact as to whether CSC's termination of plaintiff's employment was retaliatory. Defendants are therefore entitled to summary judgment.

### I. Legal Standard

The FMLA grants eligible employees the right "to a total of 12 workweeks of leave during any 12-month period . . . [i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). The statute also makes it unlawful for an employer to retaliate against an employee for exercising or attempting to exercise a right established by the FMLA. *Id.* § 2615(a); *see De Figueroa v. New York*, 403 F. Supp. 3d 133, 153 (E.D.N.Y. 2019).

Plaintiff contends that defendants retaliated against her by terminating her for exercising her FMLA rights. The parties frame this claim as arising under 29 U.S.C. § 2615(a)(2) and § 2615(b), *see* Defs. Br. at 7; Pl. Mem. of L. in Opp'n to Summ. J. at 7 ("Pl. Br.") (Dkt. #32), but those sections prohibit an employer from retaliating against an employee "for opposing any practice made unlawful" by the FMLA, § 2615(a)(2), and from interfering with proceedings or inquiries relating to an employee's FMLA rights, *see* § 2615(b). Instead, "FMLA retaliation claims like" plaintiff's—"*i.e.* terminations for exercising FMLA rights by, for example, taking

7

legitimate FMLA leave"—"are actionable under § 2615(a)(1)." *Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 167 (2d Cir. 2017); *see* 29 U.S.C. § 2615(a).

Courts in this circuit evaluate FMLA retaliation claims under the burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016); *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004). To establish a prima facie case of FMLA retaliation, a plaintiff must put forward evidence that "1) [s]he exercised rights protected under the FMLA; 2) [s]he was qualified for h[er] position; 3) [s]he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Graziadio*, 817 F.3d at 429.

"If the plaintiff makes out a prima facie case" of FMLA retaliation, "the defendant must demonstrate a legitimate, non-discriminatory reason" for its employment action. *Ibid.* "[I]f the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual." *Ibid.* A plaintiff's "burden at the prima facie stage is minimal," and where a plaintiff "does not argue that [defendants] failed to proffer a legitimate, nondiscriminatory explanation for [their] adverse employment action," the Second Circuit has deemed it "appropriate" to "proceed directly to the third step of the *McDonnell Douglas* analysis." *Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 75-76 (2d Cir. 2016).

To survive summary judgment once a defendant has presented a legitimate explanation for its employment action, a plaintiff must present "not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *see DiCesare v. Town of Stonington*, 823 F. App'x 19, 24 (2d Cir. 2020); *Serby v. New York City Dep't of Educ.*,

526 F. App'x 132, 135 (2d Cir. 2013). This standard is met if the employee's protected conduct was a "negative factor" in an employment action. *See Woods*, 864 F.3d at 169; 29 C.F.R. § 825.220(c); *see also, e.g.*, *Patel v. Long Island Univ.*, No. 17-CV-2170, 2020 WL 869125, at *4 (E.D.N.Y. Feb. 21, 2020); *Chauca v. AdvantageCare Physicians, P.C.*, No. 18-CV-2516, 2019 WL 4247495, at *4 (E.D.N.Y. Sept. 6, 2019).

Retaliatory intent can be shown through direct evidence, such as actions or comments showing retaliatory animus, or indirect evidence, such as evidence that the adverse employment action occurred in close temporal proximity to the protected conduct or evidence of disparate treatment among employees. *Alexander v. Bd. of Educ.*, 107 F. Supp. 3d 323, 328-29 (S.D.N.Y. 2015), *aff'd*, 648 F. App'x 118 (2d Cir. 2016); *see Graziadio*, 817 F.3d at 430.

## II. Analysis

Plaintiff has failed to put forward evidence of pretext sufficient to avoid summary judgment. She does not dispute that defendants have set forth a facially nondiscriminatory reason for her termination—CSC's reduction in force. *See* Pl. Br. at 9; *see also Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 359, 361 (S.D.N.Y. 2012) (stating that a reduction in force is a legitimate, nondiscriminatory reason for termination); *Museau v. Heart Share Human Servs. of New York*, No. 12-CV-1851, 2014 WL 1277006, at *8 (E.D.N.Y. Mar. 27, 2014). Consistent with the Second Circuit's guidance in *Walsh*, the Court may therefore assume that plaintiff has met her "minimal burden" of establishing a prima facie case of retaliation and proceed directly to the issue of pretext. *See Walsh*, 828 F.3d at 75-76; *see also, e.g., Patel*, No. 17-CV-2170, 2020 WL 869125, at *4; *Ottley-Cousin v. MMC Holdings, Inc.*, No. 16-CV-577, 2019 WL 1994488, at *19 (E.D.N.Y. May 6, 2019).

Turning to that prong of the FMLA analysis, plaintiff has not put forward evidence to support a rational finding that the legitimate, nonretaliatory reason for plaintiff's termination put forward by CSC was pretextual. It is undisputed that CSC's AT&T group had undergone several reductions in force, causing the group to "steadily decline[]" in size. Pl. 56.1 ¶¶ 9, 26. And it is undisputed that plaintiff was dismissed after CSC management again required Zipp to choose two employees for termination. *Id.* ¶ 54; Pl. Br. at 5; *see Museau*, No. 12-CV-1851, 2014 WL 1277006, at *8 (finding that termination based on a "funding shortage" was not pretextual because "[p]laintiff was one of eight employees laid off in early 2012 as a result of the funding shortfalls" and "[n]umerous other employees resigned, retired, or were terminated"). Plaintiff also does not dispute that she was one of the lowest rating performers in Zipp's group. *See* Pl. 56.1 ¶ 63. Nor does she dispute that her work could be redistributed to other employees—and that her responsibilities were indeed redistributed to existing employees after she was terminated. *Id.* ¶¶ 55-59; *see Barletta v. Life Quality Motor Sales Inc.*, No. 13-CV-2480, 2016 WL 4742276, at *5 (E.D.N.Y. Sept. 12, 2016) (finding no pretext where employer terminated plaintiff in an economic downturn and "[p]laintiff was not replaced by a new hire after his termination as [other employees] took over [p]laintiff's responsibilities").

Instead, plaintiff argues that defendants' explanation for her termination is "contradictory" because Comello was removed from the layoff list, whereas plaintiff was not. Pl. Br. at 9. But whether CSC was correct to replace Comello on the layoff list with Marenda has minimal probative value regarding whether CSC's termination of plaintiff was retaliatory. Plaintiff was not the employee terminated in place of Comello. *See* Defs. 56.1 ¶¶ 55-57; Zipp Dep. at 112-113; *see also* Pl. Br. at 5-6. And plaintiff has not argued that her performance ratings were higher than Comello's or that plaintiff had specialized skills that made redistribution of her responsibilities

10

impracticable, *see* Pl. Br. at 5, 8, akin to the skills involving ITMS tables that defendants assert were CSC's reason for retaining Comello, *see* Defs. 56.1 ¶¶ 55-57. Under these circumstances, the fact that Marenda was terminated instead of Comello does not show a causal link between *plaintiff's* termination and her FMLA leave.

Moreover, several undisputed facts undermine plaintiff's claim that CSC's decision to terminate her employment was retaliatory. For one thing, there is no dispute that at least five employees under Zipp's supervision had taken FMLA leave since 2009, and that Marenda, the employee that was laid off at the same time as plaintiff, had never taken FMLA leave. Pl. 56.1 ¶ 68; *see Muhleisen v. Wear Me Apparel LLC*, 644 F. Supp. 2d 375, 386 (S.D.N.Y. 2009) (finding no retaliatory intent where plaintiff claimed she was terminated in retaliation for taking maternity leave, in part because another woman employee, who had never taken maternity leave but whose performance reviews were similar, was terminated in the same month). For another, plaintiff had been reinstated to her position with the same responsibilities every time she took FMLA leave. Pl. 56.1 ¶¶ 43-44, 48, 52; *see Kim v. Goldberg, Weprin, Finkel Goldstein, LLP*, 862 F. Supp. 2d 311, 320-21 (S.D.N.Y. 2012) (finding no pretext where plaintiff's allegations of discrimination were "undermined" by the fact that after taking FMLA leave she "was reinstated in the same position with the same title, responsibilities and pay" and was not terminated until four months after her return).

Plaintiff also relies on two sets of statements in opposing summary judgment: several text messages and emails that Zipp sent plaintiff about work while she was on FMLA leave, and remarks that Zipp allegedly made to project manager Pennisi. *See* Pl. Br. at 9-10. But Zipp's communications to plaintiff while she was on FMLA leave do not create a genuine issue of material fact as to whether CSC's reasons for ending plaintiff's employment were pretextual. Plaintiff

11

emphasizes that Zipp asked plaintiff whether she approved a date for the deployment of a "migration project" "on the QT of course." Monaco Aff. ¶¶ 11-12; *see id.*, Ex. 1 at 5. But plaintiff does not dispute that she told Zipp he could reach out to her with work-related questions. *Id.* ¶ 9. And while plaintiff testified that she agreed to work on the migration project while on leave because she "felt obligated" to do so, *id.* ¶ 10, she admits that Zipp had told her that she should not feel obligated to do work on the project, Pl. 56.1 ¶ 51; *see* Zipp Dep. at 91:24-93:11.

Plaintiff also points to a text message in which Zipp asked plaintiff, "how's vacation?" before asking plaintiff another question about work. Monaco Aff. ¶ 12; *id.*, Ex. 1 at 1. But Zipp's characterization of plaintiff's leave as "vacation" does not, without more, support a reasonable inference that Zipp or others weighed plaintiff's FMLA leave against her during the reduction in force. Indeed, when plaintiff was asked in her deposition whether her "conclusion that [she was] terminated in '17 because of taking FMLA leave is based solely on [her] opinion," plaintiff answered, "Yes." Monaco Dep. at 122:19-22. Such "speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn." *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005).

Nor has plaintiff demonstrated a genuine dispute of material fact as to retaliatory intent based on her allegations regarding remarks that Zipp made to project manager Pennisi. Plaintiff alleges that in 2016, Pennisi told her that Zipp had asked Pennisi in connection with the staffing of a project, "would you rather have [plaintiff] for 9 months a year or David Gonzalez for 12 months a year?" Monaco Aff. ¶ 13; Monaco Dep. at 120:25-121:20; *see* Pl. Br. at 9. Contrary to defendants' arguments, that statement does not appear to be inadmissible hearsay. *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(4) (stating that evidence on a motion for summary judgment must be

12

"admissible" and that affidavits used to oppose summary judgment must "set out facts that would be admissible in evidence"). A statement is not hearsay if it is "offered against an opposing party and . . . made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). Pennisi's statement appears to fall within that hearsay exception because it was "within the scope" of Pennisi's employment, as "an advisor or other significant participant in the decision-making process that is the subject matter of the statement." *Evans v. Port Auth. of New York & New Jersey*, 192 F. Supp. 2d 247, 263 (S.D.N.Y. 2002) (quoting *United States v. Rioux*, 97 F.3d 648, 661 (2d Cir. 1996)); *see Holleman v. Art Crating Inc.*, No. 12-CV-2719, 2014 WL 4907732, at *25 (E.D.N.Y. Sept. 30, 2014).

Nevertheless, Zipp's alleged statement to Pennisi in 2016 or before does not raise a genuine issue of material fact as to whether CSC's explanation for plaintiff's 2017 termination was pretextual. Plaintiff has offered no evidence connecting Zipp's alleged statement regarding the staffing of a particular project to plaintiff's termination in 2017. She does not suggest that whether she worked on the project in question had consequences for her performance ratings at CSC, for example. Moreover, plaintiff stated in her deposition that she learned of the conversation in question in January 2016—a full year before her termination. *See* Monaco Dep. at 120:25-121:20. The apparent gap in time between Zipp's alleged remark about the staffing of a particular project and plaintiff's termination attenuates any connection between the two events. *See Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) ("[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination."), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009).

Courts in this circuit have consistently held that similarly oblique remarks "are insufficient to sustain a reasonable inference" of an employer's pretext. *Muhleisen*, 644 F. Supp. 2d at 388 (statement "that plaintiff needed to return quickly from maternity leave" was "too ambiguous to be probative" of discriminatory intent); *Choi v. Ferrellgas, Inc.*, No. 17-CV-3518, 2020 WL 122976, at *10 (E.D.N.Y. 2020) (employer's comment that he had "moved [plaintiff] into that spot as a place holder and we will discuss her future when she returns from leave" was insufficient to show pretext on summary judgment); *Simmons v. Akin Gump Strauss Hauer & Field, LLP*, No. 10-CV-8990, 2011 WL 4634155, at *5, *7-*9 (S.D.N.Y. Oct. 6, 2011) (granting summary judgment to employer where supervisors told plaintiff she spent too much time out of the office to develop her skills and client relationships, and that they were "looking forward to working with [plaintiff] on an uninterrupted basis next year" before terminating her), *aff'd*, 508 F. App'x 10 (2d Cir. 2013); *cf. Ottley-Cousin*, No. 16-CV-577, 2019 WL 1994488, at *18 (finding a material factual dispute where employer said it was "unreal" that plaintiff was on leave; wrote in an email that she "really [did not] want [plaintiff] back"; told plaintiff during the period of leave, "[f]rom what I understand, you no longer work for this company"; and only two months passed between plaintiff's leave and the employer's adverse action).

What's more, plaintiff does not dispute that Zipp helped plaintiff in her efforts to find a different role within CSC, *see* Pl. 56.1 ¶ 69; Monaco Dep. at 32:16-33:2, which casts further doubt on plaintiff's claim that Zipp recommended plaintiff's termination with retaliatory intent. *Thomsen v. Stantec, Inc.*, 483 F. App'x 620, 623-24 (2d Cir. 2012) (affirming summary judgment for employer on FMLA retaliation claim in part because plaintiff's supervisor made "substantial efforts" to find work from other offices within the company for plaintiff).

In sum, plaintiff has failed to raise a genuine issue of material fact as to whether CSC's nonretaliatory explanation for the termination of her employment was pretextual. Defendants are therefore entitled to summary judgment.

## CONCLUSION

Defendants' motion for summary judgment is granted.

SO ORDERED.

                                       /s/ Rachel Kovner
                                       RACHEL P. KOVNER
                                       United States District Judge

Dated: April 30, 2021
       Brooklyn, New York